# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JAMIE J. MCGEE,

      Plaintiff,

   v.

MILWAUKEE COUNTY; DAVID A. CLARKE, JR.;
RICHARD E. SCHMIDT; NANCY EVANS;
JOSHUA BRIGGS; STEVEN HAW; GEORGE GOLD;
CRYSTALINA MONTANO; JEFFREY ANDRYKOWSKI;
JANET BORUCKI; LIEUTENANT HANNAH;
LIEUTENANT GROVE; LIEUTENANT ARTUS;
LIEUTENANT SOLOMON; LIEUTENANT TURNER;
LIEUTENANT MAJEED; JORDON JOHNSON;
JOSHUA MIKULECKY; RAFAEL BRITO;
MATTHEW CARROLL; MICHAEL ZETTING;
JEFFREY HURLEY; KEVIN JOHNSON;
JOSHUA LEGERE; LAUREN PACHMEYER; John Does #1-10;
ARMOR CORRECTIONAL HEALTH SERVICES, INC.;
KAREN HORTON, M.D.; KAREN GRAY;
MAI BRUNO; ERIN QUANDT;
JOEL DEWITT; and JOHN DOES #11-20.

      Defendants.

COMPLAINT

Civil Action No.

---

## I.    INTRODUCTION

1.     This is a civil rights action under 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act, and Wisconsin law, due to the grievous and inhumane mistreatment of Jamie McGee, a 24-year-old man with a history of health problems including post traumatic stress disorder (PTSD), who was subjected to punitive deprivation of water, edible food, and bedding while in the custody of Milwaukee County Jail in May 2016.

1

2.      When McGee arrived at the Milwaukee County Jail in May, 2016, he was erroneously identified as being on discipline status, referred to Pod 4D, and placed in an isolated cell. Shortly thereafter, he was put on suicide watch. After clearing suicide watch the next day, he suffered a medical emergency and reported regurgitating blood to jail staff and medical responders. McGee was encouraged to monitor his symptoms and consume fluids. In the early morning hours of the next day, McGee was moved to another cell. Per the order of the on-duty lieutenant, all of McGee's bedding items were removed from his cell and he was completely deprived of access to water from both his faucet and toilet.

3.      McGee suffered another medical emergency the next afternoon and water was subsequently restored— approximately 18 hours after it had been turned off. When his water was reconnected, however, it began to continuously dispense hot water which McGee was unable to drink or turn off. After nearly a full day of the uninterrupted running of hot water, McGee was finally able to get the attention of jail staff, claiming that he would kill himself if the jail did not stop the running water and make it cold so he could drink it. Jail staff purportedly attempted to rectify the water situation but were unable to correct the problem. Despite the fact that the problem persisted, McGee was disciplined and and punished for the alleged disruption of jail services due to the feigning of suicidal ideation. Mr. McGee's access to usable water was eventually restored after no less than 36 hours.

4.      In addition to locking him in an isolation cell without bedding materials and depriving him of any access to water, the defendants further punished McGee by only providing him any form of sustenance through "nutraloaf," a borderline inedible foodstuff designed to punish

2

inmates that would be rendered impossible to eat without being accompanied by water or other liquid. Adding insult to injury, McGee was only forced to endure this series of cruel privations and severe mistreatment because his jail status was erroneously classified from the time of his entry to Milwaukee County Jail.

5.      Mr. McGee is just one of a number of individuals who have been subjected to these inhumane forms of punishment, mistreatment, and civil rights violations at the Milwaukee County Jail administered by former Sheriff David Clarke and Richard E. Schmidt, his assistant. Approximately two weeks prior to the arrival of Mr. McGee, jail staff had deprived another inmate, Terrill Thomas, of water until he expired due to severe dehydration. Thomas's death and McGee's mistreatment reflect an entrenched policy and practice to punish inmates through tortuous deprivation of essential life-sustaining needs, such as water, that was broadly sanctioned by jail officials.

6.      McGee brings this action to hold defendants accountable for subjecting him to inhumane conditions, cruel and unusual punishment, and deliberately indifferent mistreatment in violation of his civil rights under 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments of the United States Constitution, the Americans with Disabilities Act, and Wisconsin law. He seeks punitive damages, among other damages, for the egregious imposition of inhumane policies and practices that had been known to Defendants to have injurious and even fatal consequences in recent similar situations.

## II.      JURISDICTION AND VENUE

7.      This action is brought under 42 U.S.C. § 1983, due to the Defendants' actions under color of state law depriving Plaintiff of the rights secured under the United States Constitution.

8.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution.  This Court has original jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

9.     The Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a).

10.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because the conduct giving rise to Plaintiff's claims occurred in this judicial district and the Defendants primarily reside in this district.

### III.     PARTIES

A.     <u>PLAINTIFF</u>

11.     Plaintiff Jamie J. McGee is a citizen of the United States, residents of the State of Wisconsin, with a date of birth of March 16, 1992. At all times material hereto, Jamie J. McGee was an inmate, as a pre-trial detainee, residing at the Criminal Justice Facility (a/k/a Milwaukee County Jail) of the Milwaukee County Sheriff's Office ("MCSO"), and was entitled to all rights, privileges, and immunities accorded all residents of Milwaukee County, the State of Wisconsin, and citizens of the United States, pursuant to the Constitution of the United States of America.

12.     Plaintiff seeks damages for compensatory, nominal, and punitive damages in additional to any other relief the Court deems just and equitable.

B.     <u>DEFENDANTS</u>

13.     Defendant Milwaukee County is a municipal corporation, organized under the laws of the State of Wisconsin. Milwaukee County is a "person" for purposes of 42 U.S.C. §

4

1983 and is also a "public entity" under 42 U.S.C. § 12131(1). Milwaukee County has executive offices located at 901 N. 9th Street, Suite 306, Milwaukee, Wisconsin 53233, and offices of its Corporation Counsel being located at 901 N. 9th Street, Suite 303, Milwaukee, Wisconsin 53233. Milwaukee County owns and operates the Milwaukee County Jail (a/k/a Milwaukee County Criminal Justice Facility). One component of the jail is Pod 4D, a pod where those housed in the jail are kept ostensibly for disciplinary or behavioral reasons. The County, through its actions by the Milwaukee County Sheriff's Office, is responsible for training, supervising, and disciplining jail employees; adopting, implementing, and enforcing jail policies and practices; and ensuring that jail conditions, discipline policies and practice, and the overall treatment of inmates complies with the United States Constitution and other federal, state, and local laws. The County is therefore liable for the jail policies, practices, and customs that caused the harm alleged below. Under Wis. Stat. § 895.46(1)(a), the County is required to pay or indemnify all judgments, including for compensatory and punitive damages, attorneys' fees, and costs that may be awarded against its officials and employees.

14. Defendant David A. Clarke, Jr. was the sheriff of Milwaukee County Jail at all relevant and material time periods to this action, and had direct control over the management and operations of the Milwaukee County Jail at the time McGee's claim accrued and for fourteen years prior. Defendant Clarke was ultimately responsible for the training, supervising, and disciplining jail employees; adopting, implementing, and enforcing jail policies and practices; and ensuring that jail conditions, discipline policies and practice, and the overall treatment of inmates complies with the United States Constitution and other federal, state, and local laws as well as written jail policies. Under Wis. Stat. § 302.336(2), Defendant Clarke was legally responsible for the confinement, maintenance, and medical care of all persons confined in the Milwaukee County Jail.

5

15.     Defendant, Richard E. Schmidt is an adult citizen of the United States and a resident of the State of Wisconsin. At all relevant and material time periods to this action, Defendant Schmidt was employed by the Milwaukee County Sheriff's office as the Jail Administrator and was ultimately responsible for the health, safety, security, welfare and humane treatment of all inmates at the jail. At all times material hereto, Defendant Schmidt oversaw medical, clerical, correctional officers, and staff assigned to the jail. At all times material hereto, Defendant Schmidt also oversaw, supervised, and had control over the management and operation of the entire Sheriff's Department, and was responsible for the MSCO's policies, procedures, and training. At all times material hereto, Defendant Schmidt was aware of the MCSO and it's staff's deficiencies in training and compliance with regard to its own rules relating to the humane and appropriate treatment of its inmates, but took no action to remedy the deficiencies. At all times material hereto, Defendant Schmidt was deliberately indifferent to the Constitutional rights of McGee by ignoring the Justice Facility's staff's lack of sufficient training in policies and procedures, both written and unwritten, to adequately care for inmates such that their health, safety, and civil rights are not put at risk.

16.     Defendant Nancy Evans is a citizen residing in the State of Wisconsin. Defendant Evans was commander of the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant and material times. As commander of the jail, she had direct control over the management and operations of the Milwaukee County Jail during May 2016 and for approximately one year preceding it. She was responsible for training and supervising jail employees; adopting, implementing, and enforcing jail policies; and ensuring that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies.

6

17.     Defendant Joshua Briggs is a citizen residing in the State of Wisconsin. Defendant Briggs was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant and material time period. Defendant Briggs, in his role as lieutenant, supervised correctional officers and therefore had a duty to ensure that jail conditions and the treatment of inmates complied with the United States Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

18.     Defendant Steven Haw is a citizen residing in the State of Wisconsin. Defendant Haw was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant and material time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

19.     Defendant George Gold is a citizen residing in the State of Wisconsin. Defendant Gold was a captain in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

20.     Defendant Crystalina Montano is a citizen residing in the State of Wisconsin. Defendant Montano was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role she supervised

7

correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. Her duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

21.     Defendant Jeffrey Andrykowski is a citizen residing in the State of Wisconsin. Defendant Andrykowski was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies.

22.     Defendant Janet Borucki is a citizen residing in the State of Wisconsin. Defendant Borucki was a captain in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role she supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. Her duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016

23.     Defendant Lieutenant Hannah is a citizen residing in the State of Wisconsin. Defendant Hannah was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

8

24.     Defendant Lieutenant Grove is a citizen residing in the State of Wisconsin. Defendant Grove was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

25.     Defendant Lieutenant Artus is a citizen residing in the State of Wisconsin. Defendant Artus was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

26.     Defendant Lieutenant Solomon is a citizen residing in the State of Wisconsin. Defendant Solomon was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

27.     Defendant Lieutenant Turner is a citizen residing in the State of Wisconsin. Defendant Solomon was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period.  In that role he supervised

9

correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

28. Defendant Lieutenant Majeed is a citizen residing in the State of Wisconsin. Defendant Majeed was a lieutenant in the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he supervised correctional officers and had a duty to ensure that jail conditions and the treatment of inmates complied with the United State Constitution and other federal, state, and local laws, as well as written jail policies. His duties involved the jail's segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

29. Defendant JorDon Johnson is a citizen residing in the State of Wisconsin. Defendant Johnson was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

30. Defendant Joshua Mikulecky is a citizen residing in the State of Wisconsin. Defendant Mikulecky was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

10

31. Defendant Rafael Brito is a citizen residing in the State of Wisconsin. Defendant Brito was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

32. Defendant Matthew Carroll is a citizen residing in the State of Wisconsin. Defendant Carroll was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

33. Defendant Michael Zetting is a citizen residing in the State of Wisconsin. Defendant Zetting was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Plaintiff. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

34. Defendant Jeffrey Hurley is a citizen residing in the State of Wisconsin. Defendant Hurley was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

35. Defendant Kevin Johnson is a citizen residing in the State of Wisconsin. Defendant Johnson was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible

11

for the health, safety, security, and welfare of inmates confined in the jail, including McGee. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

36. Defendant Joshua Legere is a citizen residing in the State of Wisconsin. Defendant Legere was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role he was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Plaintiff. He worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

37. Defendant Lauren Pachmeyer is a citizen residing in the State of Wisconsin. Defendant Pachmeyer was a correctional officer at the Milwaukee County Jail and an employee of the Milwaukee County Sheriff's Office during the relevant time period. In that role she was responsible for the health, safety, security, and welfare of inmates confined in the jail, including Plaintiff. She worked in the segregation unit (Pod 4D) one or more times between May 12 and May 17, 2016.

38. Defendants John Does #1-10 are adult citizens of the United States and residents of the State of Wisconsin. At all times material and relevant, John Does #1-10 were employed as correctional officers/staff at the Milwaukee County Sheriff's Office and Milwaukee County Jail, and were ultimate responsible to ensure all inmates were treated humanely and that their health, safety, and welfare were maintained to constitutional and basic human standards. At all times material and relevant, John Does #1-10 were acting under color of state law.

39. All individual County defendants named above were acting under color of state law during the relevant time and material periods and are sued in their individual capacities and official capacities, as they were deliberately indifferent to the constitutional and statutory rights of McGee. All individuals County defendants named knew there was a substantial risk of serious harm to inmates like McGee due to the jail and its staff's customs, polices, and practices.

12

40. Defendant Armor Correctional Health Services, Inc. ("Armor") is a for-profit correctional healthcare corporation, incorporated under the laws of the State of Florida, doing business in the State of Wisconsin. Armor's Principal Office is located at 4960 S.W. 72nd Avenue, Suite, #400, Miami, FL 33155, with its Registered Agent being CT Corporation System located at 8020 Excelsior Drive, Ste. 200, Madison, WI 53717. Armor is considered a "person" for purposes of 42 U.S.C. § 1983. Armor acted under color of state law to provide medical and mental health services to inmates at the Milwaukee County Jail, pursuant to a contract with the County, during the relevant and material time period. Armor was responsible for adopting, implementing, and enforcing policies and practices to make certain that the care provided to jail inmates met minimum constitutional and other legal standards and requirements.

41. Defendant Karen Horton, M.D. is a citizen residing in the State of Wisconsin. Defendant Horton was the medical director for the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant and material time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including McGee.

42. Karen Gray is a citizen residing in the State of Wisconsin. Defendant Bruno was nurse at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant and material time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including McGee.

43. Defendant Mai Bruno is a citizen residing in the State of Wisconsin. Defendant Bruno was an social worker at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant and material time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including McGee.

13

44. Defendant Erin Quandt is a citizen residing in the State of Wisconsin. Defendant Quandt was a social worker at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant and material time period. In that role, she was responsible for the health and welfare of inmates confined in the jail, including McGee.

45. Defendant Joel DeWitt is a citizen residing in the State of Wisconsin. Defendant DeWitt a medical prover at the Milwaukee County Jail and an employee of Armor Correctional Health Services, Inc. during the relevant and material time period. In that role, they were responsible for the health and welfare of inmates confined in the jail, including McGee.

46. Defendants John Does #11-20 are adult citizens of the United States and residents of the State of Wisconsin. At all times material and relevant, John Does #11-20 were employed at the Milwaukee County Jail by Defendant Armor, Milwaukee County, and/or Milwaukee County Sheriff's Office, and were ultimately responsible for providing health care to inmates and had a duty to report and intervene if an inmate or his conditions were inhumane or contrary to their medical advice and treatment. At all times material and relevant, John Does #11-20 were acting under color of state law.

47. All individual Armor defendants named above were acting under color of state law during the relevant time and material periods and are sued in their individual capacities and official capacities, as they were deliberately indifferent to the constitutional and statutory rights of McGee. All individuals Armor defendants named knew there was a substantial risk of serious harm to inmates like McGee due to the jail and its staff's customs, polices, and practices.

14

## IV. FACTUAL ALLEGATIONS

A. <u>Plaintiff Jamie McGee's Inhumane Treatment in the Milwaukee County Jail</u>.

47.     McGee was transferred to Pod 4D of the Milwaukee County Jail on May 12, 2016, from the House of Corrections, and entered the Pod from the transition area at approximately 1:11 p.m.

48.     McGee entered the jail with a history of mental health concerns, including PTSD, as well as physical limitations relating to his throat, esophagus, and voice, due to past injuries. McGee has difficulty swallowing and a limited ability to raise his voice. These health issues persisted throughout McGee's incarceration at the Milwaukee County Jail.

49.     At the time of his entry to Pod 4D, McGee was incorrectly classified as being on "discipline" status.

50.     On May 12, 2016, at approximately 2:56 p.m., McGee was put on suicide watch.

51.     At approximately 4:18 p.m. on May 13 2016, McGee was cleared from suicide watch. McGee's status was to remain in Pod 4D on discipline status for security. He was later transferred to Cell 1 within Pod 4D.

52.     On May 13, 2016, McGee suffered a medical emergency, reporting regurgitating blood. Medical providers, including Mai Bruno, responding to the emergency call at approximately 10:37 p.m. advised McGee to continue observing his symptoms and encouraged fluid intake.

53.     In the early morning hours, before approximately 4:25 a.m. on May 14, 2016, McGee was moved to cell 20 for discipline. Lieutenant Montano ordered that all of McGee's bedding items were to be removed from his cell and his water was to be turned off as punishment for alleged violations of Pod 4D rules. These violations appear to have been McGee's use of

15

sheets/clothing to cover his cell window in order to gain the jail staff's attention when unable to do so vocally or otherwise. Turning off McGee's water included turning off the water to both the faucet and toilet in his cell.

54.     Captain Borucki was notified of the decision and action to remove McGee's bedding items, mattress, and denial of water as punishment shortly thereafter.

55.     On the morning of May 14, 2016, the third shift correctional officers and supervisors informed the first shift Captain and Lieutenant of McGee's situation.

56.     At approximately 6:49 a.m. on May 14, 2016, the next shift of correctional officers inspected of McGee and his cell. Officer Brito told McGee that his water had been turned off per the third shift Lieutenant and noted that his mattress had already been removed from his cell. Brito indicated the jail would continue to withhold both water and his mattress until McGee complied with jail rules.

57.     At approximately 3:27 p.m. on May 14, 2016, McGee began suffering chest pains and a medical emergency was called. McGee had not had access to drinking water for approximately 11 hours. Despite the medical emergency response by jail and Armor Correctional Health staff, Mr. McGee's water remained turned off and there appears to have been no change made to the May 13, 2016, medical instructions encouraging fluid intake.

58.     Between approximately 9:30 and 11:00 p.m. on May 14, 2016, McGee's mattress, sheets, and blankets were abruptly returned to him, and his water was restored, pursuant to a correctional officer's determination that McGee's jail status was only "PC" (protective custody). Concordantly, it was also determined that McGee should not have been receiving nutraloaf in lieu of regular meals.

16

59.     Unfortunately, only McGee's hot water was restored. It ran continuously and remained undrinkable until approximately 8:30 p.m. on May 15, 2016, when McGee was forced to resort to covering his window with his bedsheet in order to attract the attention of correctional officers. Social worker Quandt spoke to Mcgee and Lt. Haw was advised of the situation. McGee indicated that he wanted his hot water turned off because it would not stop running. McGee claimed that he would kill himself if the jail did not make his hot water stop running and make it cold so as to allow him to drink it.

60.     According to jail records, at approximately 9:45 p.m. on May 15, 2016, Correctional Officer Legere purportedly attempted to turn off the hot water, but was unable to do so. No other action or alternatives that may have been attempted appear to have been recorded. Regardless, McGee was subsequently informed by Lt. Briggs that he would be placed on disciplinary status for the disruption of jail services by feigning suicidal ideation in order to bring his continued water privation to attention.

61.     Full water function was apparently restored to McGee sometime thereafter, but the precise time and date is not ascertainable given the information available at this juncture.

62.     On May 16, 2016, McGee was still being served nutraloaf in lieu of regular meals, despite the jail's previous determination that he should not be subject to that treatment.

63.     On May 17, 2016, McGee was removed from suicide watch and cleared to "GP" at that time, indicating "general population."

64.     There does not appear to have been any due process hearing or notification for McGee to have an opportunity to be heard during the instances where he was placed under discipline status while in 4D.

17

B.    General Conditions in Unit ("Pod") 4D.

65.    Unit 4D in the jail consists of small, single-person isolation cells to house detainees for discipline. There is a solid door in each cell, with a large window for officers to observe the detainees' behavior. The doors also have "food chutes" for passing meal trays through.

66.    The Unit 4D cells are equipped with only a stainless steel fixture combining a toilet and a small sink. The inmates can access this drinking water per written jail policy, which requires access to drinking water 24 hours per day, seven days per week. Detainees in 4D for discipline are not provided any water other than the water made available through the sink faucet.

67.    Detainees in 4D cannot control the flow of water to their cell. There is a locked panel adjacent to each cell door that contains access to the in-wall plumbing valves which control the flow of water into the cells. This is referred to as a "pipe chase." Only correctional officers can access the pipe chase. Inmates do not have access to the pipe chase.

68.    At around the same time as McGee was housed in 4D, the key to unlock cell pipe chases in Pod 4D was traditionally kept in the unit command center. Any officer would be able to freely access the key if they wanted access a pipe chase to turn an inmate's water on or off. At the time McGee was in Pod 4D in May 2016, a guard shutting off the valves controlling water to an inmate's cell would result in that inmate, including McGee, having no access to drinking or toilet water unless and until the water was turned back on by jail staff.

69.    Inmates in Pod 4D are required, by written jail policy, to each have a padded mattress, a bed sheet, and a blanket.

70.    Inmates in Pod 4D discipline are provided "nutraloaf" three times per day, six days a week, as their sole nutritional source. Instead of regular meals consisting of separate food

18

items contains vegetables, fruit, etc., inmates in Pod 4D provided nutraloaf receive an incredibly dry, solid, loaf of foodstuff baked together that is essentially inedible in the absence of liquid to soften it.

71.     Nutraloaf is a punitive form of food that many inmates cannot tolerate. Nutraloaf poses a substantial risk of serious harm to inmates with dietary needs or digestive limitations. In Jamie McGee's case, he was functionally unable to consume nutraloaf without water due to his health and physical issues.

72.     Pod 4D inmates remain locked in their cells 23 hours per day. Jail policy requires correctional staff to allow inmates out of their cells for an hour a day to shower, make phone calls, attempt to exercise while in restraints, and get supplies to clean their cell.

C.          Mr. McGee's Health and Medical Events.

73.     McGee entered the jail and Pod 4D with medical conditions including post traumatic stress disorder and severe limitations to his voice and swallowing functions by virtue of previous damage to his neck and esophagus.

74.     As previously noted herein, McGee suffered from multiple medical emergencies between May 12 and May 17, 2016. McGee also indicated suicidal ideation on multiple occasions during that time frame, and was subsequently put on suicide watch.

75.     The Milwaukee County Jail policies include a requirement that correctional officers inspect cells in Pod 4D every 15 minutes. The defendants in this matter frequently ignore this rule, and the records indicate that they did so during McGee's time in custody there.

19

76.     McGee's throat condition made it essentially impossible for him to consume tough, dry food without any liquid. For that reason, McGee could not eat the nutraloaf that was forced on him while he was denied water. The only water he was given during the time he lacked drinkable water through his cell faucet was a small cap full of water provided by a medical provider that responded to one medical emergency.

77.     When McGee's water was shut off to his cell, he also lost the ability to use a functional toilet or wash himself.

78.     At all times material to McGee's claims, he was entirely reliant and dependant on Milwaukee County, Milwaukee County Sheriff's Office, their employees and contractors, including Armor Health staff, for obtaining basic human necessities such as appropriate sustenance, drinkable water, bedding, and medical care.

D.     Additional Allegations Regarding Jail Policy and Misconduct.

79.     One of a number of jail policies include a requirement that routine, frequent inmate inspections occur on inmates who are placed on suicide watch.

80.     Despite McGee being on suicide watch during a substantial part of May 12 to May 17, 2016, time period, correctional officers who should have been conducting their required every-30 minute inspections deliberately did nothing to correct the failure to provide necessary water service to McGee. Officers would have come to see that McGee's water was either turned off, or running continuously on hot, as a disciplinary/punishment tool. Despite that open and obvious privation imposed on McGee, contrary to their own jail policy, they did nothing to rectify the

20

situation. Jail staff either failed to appropriately and regularly conduct inspections such that they did not see the problems in McGee's cell, or they did conduct inspections but ignored his crisis—evincing deliberate indifference as to McGee's well-being in either event.

81.     Another jail policy includes required inmate access to bedding materials. McGee was punished by jail staff through removal of his mattress. Jail staff routinely inspecting McGee's cell or those responding to emergencies would have seen the lack of mattress and known that McGee needed a mattress. Despite those unwarranted impositions upon that were McGee contrary to their own jail policy, they did nothing.

82.     At all times material to this claim, Milwaukee County Jail's written policies required staff to provide inmates with access to water 24 hours a day. By custom and practice, jail staff regularly ignored this policy and deprived inmates of their right to water. Jailers commonly turned off inmates' water as punishment for alleged misbehavior or in an attempt to force inmates to comply with their instructions. This inhumane practice took place before Mr. McGee's entry to the jail, and likely continued for some time thereafter. Milwaukee County Jail's managing officials, including former Sheriff Clarke, and supervising officers allowed this practice to occur with their knowledge, approval, and, at times, their own direction. Mr. McGee's access to water was terminated based on a lieutenant's order.

83.     Before and during McGee's time in Pod 4D, Defendants Clarke, Evans, Nyklewicz, Andrykowski, Briggs, Haw, Montano, Borucki, and other supervisors were each aware that the jail's written policies required staff to provide inmates with 24-hour access to water. These defendants knew that punishing an inmate by withholding water violated the jail's own written policies as well as basic corrections standards for staff. The defendants were also aware that, despite the jail's written policies, there was a custom of regular practice for jail staff to completely turn off inmates' access to water as punishment to to coerce or force compliance with their

21

directives. The defendants who supervised the jail staff either directly participated in turning off McGee's water or they knowingly allowed the deprivation to continue by tacitly authorizing it and otherwise failing to admonish subordinates for the breach of written policy. It was foreseeable that these acts and omissions would cause serious harm to detainees such as McGee or others not so fortunate as him, and such conduct in fact caused him unnecessary harm and suffering.

84.     Incredibly, despite the death of Terrill Thomas, another inmate in Pod 4D, who succumbed to severe dehydration after staff intentionally deprived him of water weeks prior to McGee's own time in Pod 4D, jail supervisors and staff continued to allow and practice the same punitive measures with McGee and others, continuing to risk the health and safety of the inmates in their charge.

85.     Other unconstitutional conduct and the use of deprivation as a punitive measure was permitted to continue as custom, practice, or patterns by the County, Sheriff's office, and supervising officials. These included intentional deprivation of edible food and bedding. These practices occurred with the knowledge, approval, and direction of supervisory officers and officials at the Milwaukee County Jail, without regard to inmates' health needs or medical advice regarding food or water intake.

86.     The victims of the above-described unconstitutional disciplinary practices have included inmates suffering from mental or physical debilitations and conditions. In this case, McGee suffered from PTSD, limitations to his voice, and extreme difficulty with eating food without liquid, which would have been known to defendants if McGee had been given a thorough physical and mental health intake upon entry to the jail. The jail, and its contractor Armor, have failed on a number of recent occasions to appropriately monitor inmates with mental health disorders. In 2011, a mentally ill inmate named Antonio Cowser died after not eating for five days

22

and having the water in his cell turned off. And, again, just weeks before McGee's arrival, Terrill Thomas died in Milwaukee County Jail after having the water turned off in his cell for seven days.

87.     Milwaukee County and the Milwaukee County Sheriff's office have a long history of concerns relating to providing proper care and treatment to inmates. In 2001, the County and Sheriff's office entered into a Consent Decree requiring the County to ensure proper medical care to inmates, including adequate staffing with well-trained health care providers and mental health care, directly and indirectly implicating the need for inmates to not be denied water. Dr. Ronald Shansky, was appointed as medical monitor to supervise the County's compliance with the decree. Dr. Shansky found and documented a history of past and ongoing systemic failures in the jail's healthcare system and issued multiple findings and reports regarding the jail during his tenure. Notably, in a November 15, 2016 report, Dr. Shansky found "reductions in the number of correctional officers contribute to a dangerous lack of access to health care, and may have played a role in some of the recent deaths at the Jail."

88.     At all times relevant and material to this case, Defendants Clarke, Evans, Schmidt, and other supervisors and policy makers were aware of the critical failures and flaws in the jail's operations cited by Dr. Shansky, as well as the jail and its staff failure to comply with the Christensen Consent Decree. Similarly, these supervisors and policy makers knew their staff repeatedly failed to meet these standards of care hoisted on them by virtue of their role as correctional officers. These defendants were required to ameliorate the flaws and shortcomings in their jail. At the same time, failure to fix the systemic deficiencies would foreseeable result in continued harm and constitutional deprivations being caused to inmates like McGee. Yet despite the deficiencies and warnings reported to them, the defendants deliberately chose to do nothing to solve the problems but they chose not to remedy the systemic deficiencies. This deliberate indifference and reckless disregard resulted in harm and suffering to McGee and others.

23

89.     Defendant Milwaukee County and Milwaukee County Sheriff's Office failed to sufficiently train and supervise its staff and contract providers to ensure compliance with the constitutional requirements as to inmate physical/mental health care, appropriate food, drinkable water, and other humane conditions for those jailed. Additionally, the County and Sheriff's office failed to sufficiently train and supervise its staff and employees on the appropriate and necessary methods of monitoring inmates in solitary confinement like Pod 4D. The County and Sheriff's office failed to provide training on managing, monitoring, and responding to detainees' needs with PTSD or health concerns such as swallowing or voice limitations. There is an obvious need for this training, and it was foreseeable that the County's choice not to provide such training would cause harm and deprivation to those including McGee.

90.     The County and Sheriff Clarke were required by a continuing, non-delegable duty to ensure that their corporate policymaker was fulfilling its constitutional duties to detainees. However, the County and Clarke would ultimately delegated final policy-making authority regarding jail healthcare to Defendant Armor.

91.     Milwaukee County and the Milwaukee County Sheriff's Office adopted and ratified the policies, customs, and practices of Defendant Armor as its own. Therefore, the County is liable for any unconstitutional corporate policies, customs, or practices that led to harm or constitutional deprivations being caused to jail inmates, including McGee.

92.     It was foreseeable that such policies, customs, and practices would put the health, well-being, and constitutional rights of Milwaukee County Jail inmates at risk. Those customs, policies, and practices caused and/or substantially contributed to the harm and deprivations suffered by McGee.

24

93.     Milwaukee County and its Sheriff's Office knew or should have known that the policies, practices, and customs described herein posed a substantial risk of serious harm to detainees like McGee and it was obvious that such harm would occur. Nevertheless, the County, its Sheriff's office, and its staff took no reasonable actions or steps to reduce or eliminate those risks, instead acting with deliberate indifference.

94.     There is an affirmative causal link between the policies, practices, and customs described in this complaint and the harm, deprivations, and ultimate injuries suffered by McGee.

95.     The actions and inactions of Milwaukee County and its Sheriff's Office were committed under color of state law and were the direct and proximate cause of the violations to McGee's civil rights as well as harm to his person, as described herein.

96.     McGee exhausted his available and known administrative remedies in order to achieve having his water restored, along with his other deprivations.

97.     McGee was mis-classified as to his status in the jail, including in Pod 4D. Jail and medical staff also appeared to not be certain as to McGee's status at any given juncture. McGee was never given nor was he able to retain a jail book containing instructions and guidelines for making complaints or seeking administrative remedies upon his entry to Pod 4D. McGee was unable to timely or accurately appreciate the current or correct nature of his status during his time in 4D. Therefore, it was impossible for him know with certainty whether his rights and obligations as to how and whether to seek administrative remedies. In the end, he was forced to resort to the practical means that were available.

98     It is the policy and/or custom and practice for correctional officers and supervisors ending their shifts to debrief with officers and supervisors starting their shifts information and issues that would include discipline and punishment. All Milwaukee County

25

Sheriff's Office staff working during the time frame of McGee's deprivation of rights would have had actual or constructive knowledge of the fact that his constitutional right to necessities, including water, was being denied to him, and that these violations were continuing, notwithstanding jail policy and common decency. Correctional officer defendants acted with deliberate indifference and/or intentional maliciousness toward McGee as his harm and constitutional violations against him were perpetuated for a considerable period of time.

E.      Additional Allegations Regarding Armor

99.     Defendant Armor allowed a widespread pattern, practice, or custom of unconstitutional conduct toward persons incarcerated at the Milwaukee County Jail to exist and continue, including failing to property intake, identify, and provide necessary care to inmates in segregation with medical and mental health needs.

100.    Armor failed to properly assist, intake, inventory, and plan for McGee's mental and physical health needs as it related to the conditions imposed on inmates in 4D segregation united. Armor's failure to properly inquire, assess and deliver medical care to McGee, and otherwise advise correctional officers as to McGee's limitations, was motivated by constitutionally impermissible profit-drive reasons. A policy, practice, and custom of spending insufficient funds on jail medical care in order to bolster profits on its contracts existed for year. Predictably, such limited investments had resulted in numerous incidents of harm to inmates housed in facilities such as Milwaukee County Jail that were administered by Defendant Armor for health care. It was therefore foreseeable that the inadequate budgeting and spending would cause harm

26

to Milwaukee County Jail inmates, like McGee, who were in need of proper medical intake, assessment, monitoring, care, coinciding with communication and planning with correctional officers, and such conduct caused or substantially contributed to McGee's suffering and inhumane treatment.

101.    Armor also had a widespread pattern, practice, and custom of failing to properly care for and monitor inmates with serious medical or mental health needs, particularly those in Pod 4D segregation unit.

102.    Armor failed to adequately staff its contract facilities and train its personnel to recognize, monitor, and respond to the serious medical needs of inmates, particularly those with mental illness or those with conditions involving life-sustaining necessities such as drinking or eating.    Armor had a history of hiring medical staff with essentially no correctional-medical experience, and it was foreseeable that the lack of such training would cause harm to inmates. This lack of correctional-medical experience for its employees resulted in medical providers and social workers being ill-equipped to properly assess, interpret, and treat inmate-reported physical and mental health concerns as both real medical issues and calls for help to rectify the harm and inappropriate conditions they are subject to.

103.    In another report by Dr. Shansky issued under his authority as the medical monitor in the Christensen Consent Decree, he continued to identify deficiencies in jail health care in a November 2016 report. This report addressed a serious problem relating to "instability" and vacancies in Armor's "administrative leadership and nursing leadership. He found more than 30% of total required positions in the healthcare staffing, including nurses, to be vacant. Dr. Shansky found the vacancy rate to be unacceptable, noting providing timely medical service of a quality

27

nature was problematic due to the high vacancy numbers. The deficiencies and problems extended to mental health services, as Dr. Shansky noted that the chief psychiatrist provided services just two days per week at the jail and ultimately "the main problem with regard to mental health appears to be a deficiency of prescribers and adequate presence of psychiatric leadership."

104. Additional reports found serious failings involving screening, staffing, monitoring, and the delivery of medical and mental health care. These deficiencies were otherwise known and obvious to Armor for years prior to McGee's time in Milwaukee Jail Pod 4D. Despite this knowledge, Armor and its corporate officials deliberately chose to not correct the problems and were thereby complicit in their effects, putting the lives and well-being of its incarcerated patients at risk.

105. Defendant Horton and Armor itself was aware of Armor's systemic deficiencies and lack of compliance with the Christensen Consent Decree. The Defendants, but specifically Horton, was in a position to authorize and had the duty thereon to correct these problems and deficiencies. Not only was it foreseeable that the failure for Defendant Horton and Armor to to do so would cause harm to inmates and continue to violate their constitutional rights, they chose not to remedy them– not even after the death of Terrill Thomas weeks before McGee's own stay in Unit 4D. This deliberate inaction caused McGee unnecessary harm, suffering, and infringement of his rights.

106. Defendant Horton had a duty to oversee her subordinates and staff, and to ensure compliance with medical standards of care. She either directly instructed her staff to continue providing the sub-standard care described in this complain, or she acquiesced in the conduct by personally directing it, tacitly authorized it, or otherwise failing to train or supervise

28

subordinates. It was foreseeable that these acts and omissions would cause harm to detainees such as McGee or others not so fortunate as him, and such action and inaction in fact caused his unnecessary harm and suffering.

107.     The Corporate policies of Armor, as well as its practices and customs described herein were a prime factor in McGee's unnecessary harm, suffering, and infringement of his rights.

## V.     CLAIMS FOR RELIEF

108.     The conditions under which Mr. McGee was confined, and the treatment inflicted upon him under the guise of punishment or discipline, were torturous, cruel, unusual, and beyond all bounds of human decency, and in violation of his rights under the Eighth and Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Wisconsin law. From May 12, 2016 when McGee was erroneously classified to his eventual release into general population no less than five days later, the defendants repeatedly and continuously violated McGee's constitutional and human rights which ultimately resulted in him suffering unnecessary harm and injury.

109.     Based on the foregoing allegations, all of the named defendants are liable under U.S.C. § 1983 for violating McGee's established Due Process rights, as well as his rights under the Eighth and Fourteenth Amendments to the United States Constitution by intentionally depriving him of the minimal civilized measure of life necessities, including drinking water, edible food, a mattress, bedding, and a working toilet. Each of these defendants was aware of the foreseeable risks and likelihood of him associated with his or her actions and inactions, which resulted in McGee's unnecessary suffering. Each individual defendant acted objectively unreasonable and with deliberate indifference to those risks resulting from the continuous deprivations and harm placed on McGee. The individual County defendants are also liable for

29

failing to intervene, each and every time they came upon McGee or otherwise learned he was still being denied drinkable water and bedding, to correct the constitutional infirmities and harm that was being subjected to McGee continuously during his time in Unit 4D.

110.    The actions and inactions of all individual defendants described in this complaint were committed with intent, malice, reckless disregard and/or deliberate indifference towards McGee's constitutional rights and general well-being.

111.    For all the reasons stated herein, Milwaukee County is liable under 42 U.S.C. § 1983 for upholding and continuing to utilize unconstitutional policies, practices, and customs that resulted in the violation of McGee's established Due Process, Eighth and Fourteenth Amendment rights to necessary and adequate medical and mental health care, and to the basic humane treatment and providing of life's essential necessities. These violations resulted in McGee suffering physical harm, mental anguish, and emotional distress.

112.    Milwaukee County and Jail staff held that McGee was on discipline status repeatedly between May 12 and May 17, 2016. No due process appears to have been afforded to McGee between May 12 and May 17, 2016, at the Milwaukee County Jail, as it relates to proper notice and opportunity for him to be heard. McGee faced days of not only segregation, but lack of drinking water, bedding, and consumable food, without a true notice or opportunity to be heard regarding the alleged discipline that placed him in Pod 4D. McGee has a pre-trial defense at all times relevant and material to this claim.

113.    Milwaukee County violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., by punishing McGee through deprivation of water and bedding, along with placement in isolation, while he suffered PTSD, depression, and his throat and voice disabilities. Milwaukee County discriminated against him due to his disability by virtue of imposing harsher discipline status and punishments against him when McGee tried to get official's attentions to

30

address the problems he faced through the only means they afforded him: putting sheets up and claiming suicidal ideation. Through the acts and omissions of its contractor, Armor, the County also failed to reasonably accommodate McGee's mental health and physical health needs and limitations.

### A. Claims Against Armor Correctional Healthcare Services, Inc.

114. Based on the allegations in this complaint, Defendant Armor is liable under 42 U.S.C. § 1983 for maintaining unconstitutional policies, practices, and customs that resulted in the violation of McGee's clearly established Fourteenth Amendment rights to adequate medical and mental health care and to minimal civilized measure of life's necessities. These violations harmed McGee and deprived him of his constitutionally protected basic rights.

115. All acts and omissions committed by Armor were committed with intent, malice, and/or deliberate indifference towards McGee's constitutional right sand general well-being.

116. Armor further had a duty to adequately train and supervise its employees, agents, and Milwaukee County employees assigned to work in the jail. Armor breached that duty, causing McGee's suffering as outlined above.

## VI. JURY DEMAND

117. The plaintiff demands a trial by jury.

31

## VII. REQUEST FOR RELIEF

Plaintiff asks the Court to award the following relief:

A.      All available compensatory damages, including, but not limited to, damages for Mr. McGee's mental and physical pain and suffering resulting from defendants' unlawful and inhumane behavior.

B.      Punitive damages against all individual defendants Milwaukee County and Armor Correctional Health Services, Inc.;

C.      Attorneys' fees, including reasonable fees pursuant to 42 U.S.C. § 1988, and litigation costs; and

D.      Any other relief that the Court deems just and equitable.

Dated this 13ᵗʰ day of May, 2019.

EISENBERG LAW OFFICES, S.C.

Jack S. Lindberg
SBN: 1083046
308 E. Washington Avenue
P.O. Box 1069
Madison, WI 53701
(608) 256-8356

Attorneys for Plaintiff

Dated this 13ᵗ day of May, 2019.

EISENBERG LAW OFFICES, S.C.

Stephen J. Eisenberg
SBN: 1018930
308 E. Washington Avenue
P.O. Box 1069
Madison, WI 53701
(608) 256-8356

Attorneys for Plaintiff

32