JAMIE J. MCGEE,

        Plaintiff,

        v.                                     Case No. 19-cv-707-pp

MILWAUKEE COUNTY, DAVID A. CLARKE, JR.,
RICHARD E. SCHMIDT, NANCY EVANS,
JOSHUA BRIGGS, STEVEN HAW, GEORGE GOLD,
CRYSTALINA MONTANO, JEFFREY ANDRYKOWSKI,
JANET BORUCKI, LT. HANNAH, LT. GROVE, LT. ARTUS,
LT. SOLOMON, LT. TURNER, LT. MAJEED,
JORDON JOHNSON, JOSHUA MIKULECKY,
RAFAEL BRITO, MATTHEW CARROLL,
MICHAEL ZETTING, JEFFREY HURLEY,
KEVIN JOHNSON, JOSHUA LEGERE,
LAUREN PACHMEYER, KAREN HORTON,
KAREN GREY, MAI BRUNO, ERIN QUANDT,
JOEL DEWITT, LT. MAJEED, JOHN DOE #1-10,
JOHN DOE #11-20, and ARMOR CORRECTIONAL HEALTH SERVICES,

        Defendants.

---

**ORDER SCREENING COMPLAINT (DKT. NO. 1)**

---

      Plaintiff Jamie J. McGee filed a complaint alleging that the defendants violated his civil rights, the American with Disabilities Act and Wisconsin law. At the time he filed the complaint, he was a Wisconsin state prisoner. He is represented by counsel.

## I.      Screening the Complaint

      The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C.

1

§1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

2

A.    Allegations in the Complaint

The plaintiff alleges that he was a pre-trial detainee and inmate at the Milwaukee County Jail, and the defendants subjected him to an unconstitutional deprivation of water, edible food, and bedding. Dkt No. 1 at ¶¶1, 11. The plaintiff notes that he has a history of mental health issues, including post-traumatic stress disorder. Id. at ¶¶48, 73. He also states that he has "physical limitations relating to his throat, esophagus, and voice," which limit his ability to raise his voice and make swallowing difficult; he says these limitations are the result of "previous damage to his neck and esophagus." Id. These are all the details he provides regarding his mental and physical health issues.

The plaintiff has sued former Milwaukee County Sheriff David A. Clarke, Jr.; former Milwaukee County Sheriff Richard E. Schmidt; thirteen specific supervisors in various roles at the jail; nine specific correctional officers at the jail and ten John/Jane Doe correctional officers/staff members at the jail. Id. at ¶¶13-38. He also names Armor Correctional Health Services; Dr. Karen Horton, M.D., Medical Director for the jail and employed by Armor; Karen Gray, a nurse employed by Armor and working at the jail; Mai Bruno and Erin Quandt, social workers employed by Armor and working at the jail; Joel DeWitt, a "medical prover" employed by Armor and working at the jail; and ten John Does who were employed by Armor and working at the jail. Id. at ¶¶40-46.

The plaintiff moved from the Milwaukee County House of Corrections to Pod 4D of the jail on May 12, 2016 at about 1:11 in the afternoon. Id. at ¶47. He alleges that the defendants erroneously classified him as being on "discipline status." Id. at ¶¶47, 49. The plaintiff alleges it is jail policy that Pod

3

4D inmates have a padded mattress, a bed sheet and a blanket. Id. at ¶69. Inmates in Pod 4D also are locked in their cells twenty-three hours a day (with an hour to shower, make phone calls, exercise while restrained and get cleaning supplies for their cells) and are fed only nutraloaf. Id. at ¶¶70-72. The plaintiff asserts that due to his health and physical issues, he was "functionally unable to consume" nutraloaf without water. Id. at ¶71. The plaintiff alleges that jail policy required correctional officers to inspect cells in Pod 4D every fifteen minutes. Id. at ¶75.

Around 3 p.m. on May 12, 2016—not quite two hours after he arrived— the plaintiff was placed on suicide watch. Id. at ¶50. The plaintiff alleges that it is jail policy for correctional officers to conduct routine, frequent inspections of inmates on suicide watch. Id. at ¶79.

The next day at 4:18 p.m., the plaintiff was "cleared" from suicide watch, but his "status was to remain in Pod 4D on discipline status for security." Id. at ¶51. (The plaintiff says that "later"—he doesn't say when—he was transferred to Cell 1 inside Pd D. Id.) That night, he suffered a medical emergency, reporting at around 10:30 p.m. that he was "regurgitating blood." Id. at ¶52. Medical providers, including defendant Mai Bruno, responded to the call. Id. The plaintiff alleges that the providers (he does not specify who) told him to "continue observing his symptoms" and encouraged his fluid intake. Id.

The plaintiff explains that cells in Pod 4D had only a stainless-steel combined toilet and sink, and that the only water provided to inmates who are in 4D for discipline is the water available in the sink faucet. Id. at ¶66. The plaintiff also alleges that inmates in 4D can't control the flow of water to their cells; the in-wall plumbing valves are behind a locked panel. Id. at ¶67. The key to unlock these panels was kept in the "unit command center," and the plaintiff

says that any officer could have accessed the valves and turned the water off, leaving the inmate with no drinking or toilet water unless a jail staff member turned it back on. Id. at ¶68.

The following morning, May 14, the plaintiff moved to "Cell 20" for disciplinary reasons; the plaintiff speculates that he was being punished for using his sheets and/or clothing to cover his cell window in an effort to get the attention of jail staff because he couldn't do so "vocally or otherwise." Id. at ¶53. The plaintiff alleges that as part of his punishment, defendant Lt. Montano ordered that staff remove all the plaintiff's bedding items from his cell and turn off the water to his faucet and toilet. Id. The plaintiff states that defendant Capt. Borucki was notified of Montano's decision. Id. at ¶54. He also states that the third shift staff on duty on the morning of May 14 informed the first shift Captain and Lieutenant of the plaintiff's "situation." Id. The plaintiff does not identify the first shift Captain and Lieutenant or the third shift staff that shared this information.

Around 6:49 a.m. on May 14, the unnamed first shift correctional officers inspected the plaintiff's cell. Id. at ¶56. The plaintiff alleges that defendant C.O. Brito told the plaintiff that his water was shut off per the third shift lieutenant, noted that the plaintiff's mattress already had been removed from his cell and told the plaintiff that until he complied with the jail rules, the plaintiff would continue to go without water and his mattress. Id.

The plaintiff says that around 3:30 that afternoon, he suffered chest pains and that a medical emergency was called. Id. at ¶57. The plaintiff alleges that at this point, he had not had access to drinking water for approximately eleven hours. Id. The plaintiff states that jail staff and staff employed by Armor Health Services responded to the medical emergency, but afterward, his water

5

still remained shut off and there appear to have been no changes made to the May 13, 2016 instructions encouraging him to increase his fluid intake. Id. He does not identify the jail or Armor staff who responded.

Later that night, sometime between 9:30 and 11:00 p.m., an unnamed correctional officer determined that the plaintiff's jail status "was only 'PC' (protective custody)." Id. at ¶58. The plaintiff says that "it was also determined"—he does not say by whom—that he shouldn't have been receiving nutraloaf instead of regular meals. Id. The plaintiff says that at this time, his mattress, sheets and blankets "were abruptly returned to him" and his water restored. Id.

The plaintiff asserts, however, that only his hot water was restored; he says it ran continuously and was undrinkable until around 8:30 p.m. on May 15, 2016 (the same day). Id. at ¶59. At that point, the plaintiff says, he resorted to covering his window with his bedsheet to get the attention of the correctional officers. Id. The plaintiff spoke to defendant Quandt, a social worker, and he says that Lt. Haw "was advised of the situation." Id. The plaintiff says that he "indicated"—he does not say to whom—that he wanted the hot water turned off because it wouldn't stop running, and that he claimed he would kill himself if the jail staff didn't make the hot water stop running and make it cold so he could drink it. Id.

The plaintiff says the jail records show that at 9:45 p.m. on May 15, C.O. Legere attempted to turn off the hot water but couldn't. Id. at ¶60. The plaintiff alleges that "[n]o other action or alternatives that may have been attempted appear to have been recorded." Id. The plaintiff says that "[r]egardless," Lt. Briggs later told him that he would be placed on "disciplinary status for the disruption of jail services by feigning suicidal ideation in order to bring his

6

continued water privation to attention." Id. The plaintiff states that at some point after this—he doesn't know exactly the date and time—"full water function was apparently restored." Id. at ¶61. The plaintiff says that on May 17, he was "removed from suicide watch" and cleared to general population. Id. at ¶63.

The plaintiff says that despite the jail's prior decision that he "should not be subject to that treatment," he continued to be served nutraloaf through May 16, 2016. Id. at ¶62. The plaintiff also alleges that because of his "health and physical issues," he was "functionally unable to consume nutraloaf without water." Id. at ¶71. He says that the only water he received during the period when he was denied water "was a small cap full of water provided by a medical provider that responded to one medical emergency." Id. at ¶76.

The plaintiff alleges that several policy violations occurred during his five-day stay in Pod 4D, and that the jail had a pattern or practice of disregarding policy. The plaintiff alleges that despite being on suicide watch and the requirement that correctional officers inspect every thirty minutes, the officers did nothing about the fact that the plaintiff had no water; he asserts that officers inspecting every thirty minutes would have had to see that he had no water, or had continuously running hot water, and he says either that the officers were not conducting the required inspections or that they were inspecting but ignored "the crisis." Id. at ¶¶79-80. The plaintiff alleges that the defendants violated the jail policy of providing inmates with mattresses and bedding when they took his bedding as punishment, and asserts that if officers had been conducting routine inspections as required by jail policy, they would have seen that the plaintiff needed a mattress and bedding. Id. at ¶81. The plaintiff says that there "does not appear" to have been any due process given

7

the plaintiff, or notice and opportunity for him to be heard, before he was placed on disciplinary status. Id. at ¶64.

The plaintiff alleges that jail policy requires jail staff to provide inmates with access to water twenty-four hours a day, but he asserts that "[b]y custom and practice, jail staff regularly ignored this policy and deprived inmates of their right to water." Id. at ¶82. The plaintiff asserts that "[j]ailers commonly turned off inmates' water as punishment for alleged misbehavior or in an attempt to force inmates to comply with their instructions," and the plaintiff says that this "inhumane practice" was going on before the plaintiff arrived at the jail and likely continued for some time after. Id. He asserts that the "managing officials" of the jail, including defendant former Sheriff David Clarke, as well as supervising officers, "allowed this practice to occur with their knowledge, approval, and, at times, their own direction;" he reiterates that his access to water was terminated "based on a lieutenant's order." Id.

The plaintiff alleges that defendants Clarke, Evans, Nyklewicz, Andrykowski, Briggs, Haw, Montano, Broucki and "other supervisors" were aware of the written policy to provide twenty-four hour access to water, and that those defendants knew that punishing an inmate by withholding water violated both the written policy and "basic corrections standards for staff." Id. at ¶83. He says that these defendants were aware that there was "a custom of regular practice for jail staff to completely turn off inmates' access to water as punishment to . . . coerce or force compliance with their directives." Id. He contends that the defendants "who supervised the jail staff either directly participated in turning off [his] water or they knowingly allowed the deprivation to continue by tacitly authorizing it and otherwise failing to admonish subordinates for breach of written policy." Id. The plaintiff asserts that even

8

though another inmate in Pod 4D had died of severe dehydration after staff had intentionally deprived him of water (an event the plaintiff says happened before he arrived at the jail), supervisors and staff continued to "allow and practice the same punitive measures" with the plaintiff and others. Id. at ¶84. The plaintiff says it was also a custom and practice at the jail to deprive inmates of bedding and edible food, and that these practices occurred with the knowledge, approval and direction of supervisors and officials at the jail. Id. at ¶85.

The plaintiff alleges that his particular conditions—his PTSD, limitations with his voice and "extreme difficulty eating food without liquid" would have been known to the defendants if he'd received "a thorough physical and mental health intake upon entry to the jail." Id. at 86. He accuses the jail, and defendant Armor, of several failures to properly monitor inmates with mental health issues, including a mentally ill inmate who died in 2011 after not eating for five days and having the water in his cell turned off. Id. The plaintiff claims that the jail and the sheriff's department have a "long history of concerns relating to providing proper care and treatment to inmates," and he discusses a 2001 consent decree that he says required the county to ensure certain medical treatment and "indirectly implicat[ed] the need for inmates to not be denied water." Id. at ¶87. He discusses a November 2016 report from the medical compliance monitor indicating that reduced staff may have contributed to a lack of health care and possibly to recent deaths. Id.

The plaintiff asserts that Clarke, Evans, Schmidt and other "supervisors and policy makers" were aware of the issues cited by the compliance monitor, knew that jail staff failed to meet the standards in the consent decree and failed to correct the systemic deficiencies. Id. at ¶88. He asserts that the county and the sheriff's office failed to train staff and contract providers "to ensure

9

compliance with the constitutional requirements as to inmate physical/mental health care, appropriate food, drinkable water, and other humane conditions for those jailed," and that they failed to train and supervise staff and employees "on the appropriate and necessary methods of monitoring inmates in solitary confinement." <u>Id.</u> at ¶89. He claims that they did not train "on managing, monitoring, and responding to detainees' needs with PTSD or health concerns such as swallowing or voice limitations," even though there is an "obvious need" for such training. <u>Id.</u> The plaintiff makes numerous allegations about what the county and the sheriff's department knew, what they should have known, what they failed to do and what their failures caused. <u>Id.</u> at ¶¶90-95.

The plaintiff also asserts that it is the "policy and/or custom and practice for correctional officers and supervisors ending their shifts to debrief with officers and supervisors starting their shifts information and issues that would include discipline and punishment." <u>Id.</u> at ¶98. Given this, he argues that any sheriff's office staff working at the jail during the time he was deprived of his rights would have had "actual or constructive knowledge of the fact that his constitutional right to necessities, including water, was being denied to him, and that these violations were continuing, notwithstanding jail policy and common decency." <u>Id.</u>

Regarding Armor, the plaintiff alleges that Armor "allowed a widespread pattern, practice, or custom of unconstitutional conduct toward persons incarcerated at the Milwaukee County Jail to exist and continue," including failing to properly intake, identify and provide care to inmates housed in segregation who had medical and mental health needs. <u>Id.</u> at ¶99. The plaintiff states that Armor's focus on driving profits caused this widespread failure to address medical and mental health needs, including his own. <u>Id.</u> at ¶100.

10

According to plaintiff, Armor also failed to hire appropriately experienced personnel and to train its staff to recognize, monitor and respond to inmates' medical and mental health needs, including his own. Id. at ¶¶101-102. The plaintiff states that defendant Horton knew of, and had the power to correct, Armor's deficiencies, failed to do so, and as a result, caused the plaintiff's harm. Id. ¶¶105-106.

The plaintiff asserts that he exhausted his remedies as best he could. Id. at 96. He says that he never was given a jail book with instructions about how to make complaints or pursue administrative remedies, and that he didn't really "appreciate the current or correct nature of his status during his time in 4D." Id. at ¶97. Accordingly, he says it was "impossible for him to know with certainty whether his rights and obligations as to how and whether to seek administrative remedies." Id. He says he was "forced to resort to the practical means that were available"—presumably, covering his window to draw the attention of jail staff. Id.

The plaintiff demands compensatory damages, including damages for his mental and physical pain and suffering. Id. at 32. He also demands punitive damages and attorney's fees. Id.

    B.    <u>Analysis</u>

        1.    *The Plaintiff's Claims*

The plaintiff claims that from May 12, 2016, when he was erroneously classified, through May 17, 2016 when he was released into general population, all of the defendants violated his due process rights and his rights under the Eighth and Fourteenth Amendments "by intentionally depriving him of the minimal civilized measures of life necessities, including drinking water, edible food, a mattress, bedding, and a working toilet." ¶109. He alleges that

each acted with deliberate indifference to the risks these deprivations caused him. Id. He says that the "individual County defendants" are liable for failure to intervene. Id.

The plaintiff asserts that he was not afforded due process—no notice or opportunity to be heard—before facing segregation and these deprivations. Id. at ¶112.

The plaintiff asserts that the defendants violated the Americans with Disabilities Act by punishing him—depriving him of water and bedding and placing him in isolation—when he suffered from PTSD, depression and his throat and voice disabilities. Id. at ¶113. He says that he was punished for trying to get staff attention by putting up sheets and claiming to be suicidal, even though his disabilities prevented him from getting attention in other ways, and he argues that this was discrimination. Id. He alleges that through Armor, the county failed to provide him with reasonable accommodations. Id.

Finally, the plaintiff claims that Armor (via its policies and practices) violated his Fourteenth Amendment rights to adequate medical and mental health care and humane conditions of confinement. Id. at ¶114. He also maintains a failure-to-train-and-supervise claim. Id. at ¶116.

### 2. *Dismissal of Certain Defendants/Claims*

While the PLRA requires the court to screen the complaint because the plaintiff was incarcerated when he filed it, the plaintiff is represented by counsel. The court is under no obligation to liberally construe the plaintiff's pleadings. The complaint often fails to plead "factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft, 566 U.S. at 678 (citing Twombly, 550 U.S. at 556).

The plaintiff has sued *fifty-one* defendants. In the "Defendants" section of the complaint, he named thirty-one of those defendants, and identified twenty others as "John Does." He does not explain what the John Doe defendants did to violate his rights; for example, while he says that "third shift correctional officers and supervisors" informed the first shift captain and lieutenant of the plaintiff's "situation," he does not say how this violated the plaintiff's rights, or whether these unnamed third shift officers are among the Doe defendants. Even prisoners representing themselves will identify Doe defendants as "John Doe first shift lieutenant," or "third shift CO Tim." The plaintiff makes frequent references to "correctional officers" generally, without identifying any particular officer or even describing the officer's shift or title. The plaintiff often uses the passive voice—"no change had been made," the plaintiff "was still being served nutraloaf," the plaintiff "was punished by jail staff through removal of his mattress"—making it impossible for the court to know which of the fifty-one defendants allegedly took the described actions.

Of the thirty-one defendants the plaintiff named in the "Defendants" section of the complaint—Milwaukee County, David Clarke, Richard Schmidt, Nancy Evans, Joshua Briggs, Steven Haw, George Gold, Crystalina Montano, Jeffrey Andrykowski, Janet Borucki, Lt. Hannah, Lt. Grove, Lt. Artus, Lt. Solomon, Lt. Turner, Lt. Majeed, Jordon Johnson, Joshua Mikulecky, Rafael Brito, Matthew Carroll, Michael Zetting, Jeffrey Hurley, Kevin Johnson, Joshua Legere, Lauren Pachmeyer, Armor, Karen Horton, Karen Gray, Mai Bruno, Erin Quandt and Joel DeWitt—he makes specific allegations against only ten. He makes general allegations against five others, supervisors such as Clarke, Schmidt, Evans and Horton—who he asserts "were aware" of various policies and did nothing. In paragraph 83 of the complaint, he mentions someone

13

named "Nyklewicz," but that name does not appear in the list of defendants in the caption or in the "Defendants" section.

The court will dismiss the following defendants because the complaint does not make specific allegations against them: John Does #1-20; George Gold, Lt. Hannah, Lt. Grove, Lt. Artus, Lt. Solomon, Lt. Turner, Lt. Majeed, Jordon Johnson, Joshua Mikulecky, Matthew Carroll, Michael Zetting, Jeffrey Hurley, Kevin Johnson, Lauren Pachmeyer, Karen Grey and Joel DeWitt.

The plaintiff has alleged no specific details regarding his failure to intervene claim. He states only that the "individual County defendants" failed to intervene, and he does not elaborate on how they failed to intervene or who failed to intervene. The court will not allow the plaintiff to proceed on a failure to intervene claim.

At the beginning of the complaint, the plaintiff states that he is bringing claims under "Wisconsin law." Dkt. No. 1 at ¶1. Nowhere in the complaint does he identify any Wisconsin law that the defendants violated or any state-law causes of action. The court will not allow the plaintiff to proceed on Wisconsin state law claims against any of the defendants.

>3. *Specific allegations*

>>a. Conditions-of-confinement claims against individual jail staff

The plaintiff claims that the conditions of his confinement violated his Eighth and Fourteenth Amendment rights.

Jail officials violate a pre-trial detainee's constitutional rights where they are deliberately indifferent to jail conditions that "deny 'the minimal civilized measure of life's necessities.'" Budd v. Motley, 711 F.3d 840, 842 (7th Cir. 2013) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "In the context of a conditions of confinement claim, a pretrial detainee is entitled to be free

14

from conditions that amount to 'punishment'" as opposed to conditions that are "cruel and unusual punishment". <u>Smith v. Dart</u>, 803 F.3d 304, 309 (7th Cir. 2015). Conditions that can amount to impermissible punishment include lack of edible food and no access to drinkable water. <u>Id.</u> at 312-313. Punishment in isolation without bedding also can amount to an unconstitutional condition of confinement. <u>See</u>, <em>e.g.</em>, <u>Maxwell v. Mason</u>, 668 F.2d 361, 363 (8th Cir. 1981); <u>Townsend v. Fuchs</u>, 522 F.3d 765, 774 (7th Cir. 2008)).

The plaintiff alleges that that defendants Montano, Borucki, Brito and Legere violated his Eighth and Fourteenth Amendment rights by denying him water, food and bedding.

The plaintiff has stated sufficient facts to allow him to proceed on conditions-of-confinement claim against Montano. The plaintiff says that on the morning of May 14, after he was moved to "Cell 20" for disciplinary reasons, Montano ordered staff to remove all the plaintiff's bedding items from his cell and turn off the water to his faucet and toilet. At the pleading stage, these allegations are enough for the plaintiff to state a claim that Montano deliberately subjected him to unconstitutional conditions of confinement.

The plaintiff states that Capt. Borucki was notified of Montano's decision. Liability under §1983 "can . . . attach "'if the conduct causing the constitutional deprivation occurs at [an official's] direction or with [the official's] knowledge and consent.'"" <u>Childress v. Walker</u>, 787 F.3d 433, 440 (7th Cir. 2015) (citations omitted). While somewhat vague, the court concludes that the plaintiff has stated a claim that Borucki knew about and consented to the plaintiff being deprived of bedding and water.

The plaintiff says that between 6:30 and 7:00 a.m. on May 14, during the

15

first shift officers' inspection of his cell, C.O. Brito told the plaintiff that his water was shut off at the instruction of the third shift lieutenant, noted that the plaintiff's mattress already had been removed from his cell and told the plaintiff that until he complied with the jail rules, the plaintiff would continue to go without water and his mattress. The plaintiff has stated a conditions-of-confinement claim against Brito.

The complaint makes only a single reference to C.O. Legere. The plaintiff says that the jail records show that at 9:45 p.m. on May 15—during the time when the plaintiff's water had been restored, but was hot and running continuously—Legere attempted to turn off the hot water but couldn't. In other words, he alleges that Legere tried to *improve* his conditions of confinement, not deprive him of life's necessities. From other allegations in the complaint, the court suspects that the plaintiff believes that Legere should have done something more. But the Seventh Circuit has said that "[p]ublic officials do not have a free-floating obligation to put things to rights . . . ." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). The appellate court has rejected the argument that "everyone who knows about a prisoner's problem must pay damages." Id. The court will not allow the plaintiff to proceed on a conditions-of-confinement claim against Legere.

<blockquote>b. Due process claim against individual jail staff</blockquote>

The plaintiff claims that he was impermissibly denied his Fourteenth Amendment right to due process each time they placed him on "discipline status." Dkt. No. 1 at ¶64. Pretrial detainees cannot be placed outside of the institution's general population without due process if they are placed there for punitive reasons. Miller v. Dobier, 634 F.3d 412, 425 (7th Cir. 2011). If the placement was for administrative reasons (*e.g.*, no cells available in the general

population) and temporary, placement can occur without due process. Id.

There appear to be three instances where the plaintiff alleged he was placed on "discipline status": (1) the initial erroneous placement on discipline status instead of protective custody when he arrived from the House of Corrections; (2) the move to "Cell 20," which he believes was punishment for covering up his cell window with sheets; and (3) the May 15, 2016 incident when Lt. Briggs told him that he would be placed on "discipline status" for "feigning suicidal ideation." Dkt. No. 1 at ¶¶47, 49, 53, 60.

The plaintiff does not say who was responsible for erroneously classifying him as being on disciplinary status when he arrived at the jail; he states that he was "incorrectly classified as being on discipline status" Id. at ¶ 49. Perhaps more to the point, however, as the plaintiff describes it, the classification was an administrative error that was corrected within five days, so it was not punitive and was temporary. The plaintiff has not stated sufficient facts for the court to allow him to proceed on a due process claim regarding the initial erroneous classification.

 The move to "Cell 20" on May 14, however, and the events that occurred in Cell 20, are different. The plaintiff asserts that he was moved to Cell 20 for discipline reasons, without notice or an opportunity to be heard. Dkt. No. 1 at ¶53. The plaintiff has not said who ordered him to be placed in Cell 20, although he alleged, as discussed above, that Montano ordered his bedding removed and his water turned off. Because the plaintiff received no notice or opportunity to be heard on the punishment Montano ordered, the court will allow him to proceed on a due process claim against Montano.

The plaintiff does not state a due process claim against Lt. Briggs. Following his description of Legere's attempt to turn off the hot water, the

plaintiff says that Lt. Briggs "later" told him that he would be placed on "disciplinary status for the disruption of jail services by feigning suicidal ideation in order to bring his continued water privation to attention." The plaintiff does not say that Briggs—or anyone else—followed through on this threat, and at some point after Briggs said this, the plaintiff's water was turned on and he was cleared to go into general population. The plaintiff cannot proceed on a due process claim against Briggs.

> c. Supervisory liability claims against individual jail staff

The plaintiff also alleges that defendants Clarke, Schmidt, Evans, Nyklewicz, Andrykowski, Briggs, Haw, Montano and Borucki in their supervisory capacity, violated his Eighth and Fourteenth Amendment rights. The court already has discussed the fact that the plaintiff did not name Nyklewicz as a defendant. Clarke was the sheriff at the time of the events; Schmidt was the jail administrator; Evans was "commander" of the jail; Briggs, Andrykowski, Haw and Montano were lieutenants whom the plaintiff says supervised correctional officers; and Borucki was a captain whom the plaintiff says supervised correctional officers.

The plaintiff does not allege that Clarke, Schmidt, Evans or Andrykowski were personally involved in the deprivations of his constitutional rights. The plaintiff mentions Haw specifically in his description of the events on the evening of May 15, when the hot water started running continuously. He says only that Haw "was advised of the situation." Dkt. No. 1 at ¶59. This is not sufficient to allow him to proceed on a claim that Haw personally deprived the plaintiff of humane conditions of confinement. The question is whether the plaintiff may proceed against these defendants on a theory of supervisory liability.

18

Supervisors can be held liable where the impermissible deprivation of humane conditions of confinement happens with the supervisor's knowledge or consent. Childress, 787 F.3d at 440. The supervisor has to know about an incident, policy, or practice that causes a constitutional deprivation "but nevertheless institute[s], condone[s], or willfully turn[s] a blind eye" to it. Id. The plaintiff spends several pages in his complaint asserting that these supervisors knew or should have known about the jail's practice of denying water to inmates as a punitive measure, including specific examples of other inmates suffering and dying from such deprivations, the consent decree from 2001 and administrative reports and decisions detailing the systemic problems. At this stage in the litigation, the plaintiff may proceed on a conditions of confinement claim based on supervisory liability against defendants Clarke, Evans, Andrykowski, Briggs, Haw, Montano, Borucki and Schmidt.

The court will not allow the plaintiff to proceed against these defendants in their supervisory capacities on a due process claim, however, because he has not alleged that denying due process to pretrial detainees before placing them on "discipline status" was a policy or practice of which the supervisors were aware or that they knew that the plaintiff, specifically, had been denied due process when placed on "discipline status."

d.    Armor

Armor Correctional Health Services, Inc. is, as the plaintiff indicates, a private corporation. Dkt. No. 1 at ¶40. The plaintiff asserts, however, that Armor "acted under color of state law to provide medical and mental health services to inmates at the Milwaukee County Jail, pursuant to a contract with the County, during the relevant and material time period." Id. The plaintiff has alleged that Armor is liable under §1983 "for maintaining unconstitutional

19

policies, practices, and customs that resulted in the violation of [the plaintiff's] clearly established Fourteenth Amendment rights to adequate medical and mental health care and to minimal civilized measure of life's necessities." Dkt. Id. at ¶114. He also alleges that Armor failed to adequately train and supervise "its employees, agents, and Milwaukee County employees." Id. at ¶116.

The plaintiff's claim against Armor is a form of a municipal liability claim under Monell v. Dep't of Soc. Serv's, 436 U.S. 658 (1978). In Monell, the Supreme Court held that a local government entity could be sued as a "person" under §1983 if that government's custom, practice or policy caused the constitutional violation. The Seventh Circuit has (while questioning its own policy) applied the Monell standard to private corporations that contract to provide essential government services—such a private corporation "cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." Shields v. Ill. Dep't of Corrections, 746 F.3d 782, 789 and 796 (7th Cir. 2014). See also, Hahn v. Walsh, 762 F.3d 617, 640 (7th Cir. 2014); Glisson v. Ind. Dep't of Corrections, 849 F.3d 372 (7th Cir. 2017).

The plaintiff's claims against Armor consist of rote recitations of the Monell requirements—he asserts that Armor had policies and practices that caused his constitutional deprivations but does not describe those policies or practices. Was it Armor's practice to ignore inmates in crisis? The plaintiff does not allege that Armor employees ignored him. Was it Armor's practice to deny care to inmates with mental health, or swallowing disorders? Again, the plaintiff does not allege that Armor employees ignored him. The plaintiff's allegations against Armor bring to mind the Supreme Court's classic admonishment that "a plaintiff's obligation to provide the 'grounds' of his

20

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombley, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The complaint does not state a Monell-type claim against Armor, and the court will not allow the plaintiff to proceed against Armor on that basis.

e. Armor employees

The plaintiff also seeks to bring a Fourteenth Amendment claim against individual employees of Armor—Dr. Horton, Mai Bruno and Erin Quandt—for failing to appropriately address his medical needs.[1] "A private actor may be sued under § 1983 only if the private actor's conduct is 'fairly attributable to the state.'" Rappe v. Unknown Train Conductor, No. 18-cv-6172, 2020 WL 1166179, at *2 (N.D. Ill. Mar. 11, 2020) (quoting Lugar v. Edmondson Oil Co., Inc., 7th Cir. 2007)).

> Private action can become state action when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights; where the state compels the discriminatory action; when the state controls a nominally private entity; when it is entwined with its management or control; when the state delegates a public function to a private entity or when there is such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself.

Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 815-16 (7th Cir. 2009) (source citations omitted).

Even if the private employee can be considered to have been acting under color of state law, to establish a constitutional violation regarding his medical needs, a pretrial detainee must show (1) that "the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the

---

[1] The court already has dismissed Armor defendants Karen Grey and Joel DeWitt because the plaintiff failed to make specific allegations against them.

21

consequences of their handling of [plaintiff's] case," and (2) that the medical defendants' conduct was not "objectively reasonable." McCann v. Ogle Cty., Ill, 909 F.3d 881 (7th Cir. 2018).

Regarding defendants Bruno and Quandt, the court need not analyze whether they were acting under color of state law, because the plaintiff has not alleged that either defendant acted purposefully, knowingly or recklessly or that their conduct was objectively unreasonable. The plaintiff says that Bruno responded to his medical emergency on May 13 but does not allege any specific action she did or did not take. Instead he lumps her in with an unnamed group of "medical providers" who he asserts advised the plaintiff to keep an eye on his symptoms and encouraged him to increase his fluid intake. As for Quandt, the plaintiff alleges only that she spoke to him on the evening the hot water was restored—he does not say what they discussed. The plaintiff has not alleged that anything Bruno and Quandt did, or did not do, amounted to deliberate indifference to his serious medical needs. The court will dismiss Bruno and Quandt as defendants.

Regarding Dr. Horton, the plaintiff alleges that she knew of a widespread pattern or practice of Armor failing to appropriately recognize, monitor and respond to inmates' medical needs. He further alleges that this systemic failure led to his unconstitutional treatment in Pod 4D because had Armor staff, under Dr. Horton's guidance, appropriately identified and treated his mental and physical health needs, the harm he sustained would not have occurred. The court already has concluded that the plaintiff's claims against Armor are not specific enough to allege a policy, practice or custom. Because the plaintiff has not stated a claim against Armor, he does not state a claim against Horton. The court will dismiss Horton.

f.     Milwaukee County

Finally, the plaintiff has sued Milwaukee County. As discussed above, a municipality can be held liable under §1983 if the plaintiff can show that "his injury was the result of the municipality's or corporation's official policy or custom." Rice v. Corr. Medical Servs., 675 F.3d 650, 675 (7th Cir. 2012). Such liability "'attaches where—any only where—a deliberate choice to follow a course of action is made from among various alternatives' by . . . policymakers." Id. (quoting City of Canton, OH v. Harris, 489 U.S. 378, 389 (1989)). A plaintiff can establish such a policy or custom by showing that there is an express policy; there is a widespread practice that is so well-known it is functionally the same as an express policy; or if final policy decision makers act in such a way to give the impression that there is a policy. Id.  The plaintiff also must show "a direct casual connection between the policy or practice and his injury." Id.

The plaintiff has has alleged that there was a widespread practice or custom of denying inmates water, food and bedding as punishment, and that this practice or custom caused him harm over the several days that he was deprived of water and bedding. Those allegations are sufficient to allow him to proceed on a Monell claim against the county under the Fourteenth and Eighth Amendment, challenging the conditions of his confinement. The court will not allow the plaintiff to proceed on a due process claim against Milwaukee County, because he has not alleged that there was an express policy or widespread practice within the jail of denying inmates due process rights before imposing punishments such as deprivation of water and bedding.

The plaintiff also seeks to bring an ADA claim against Milwaukee County. To state a claim under the ADA, the plaintiff must show "that he is a 'qualified

23

individual with a disability,' that he was denied 'the benefit of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability.'" Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (quoting Love v. Westville Corr. Ctr., 103 F.3d 558, 560 (7th Cir. 1996)). The plaintiff's ADA complaint is too vague to state a claim upon which the court can grant relief. He doesn't plead with specificity how he is a qualified individual with a disability. He mentions PTSD, depression and a throat condition for which he provides no details. He asserts that individual officers punished him for getting their attention by covering his windows and claiming to be suicidal, and asserts that the officers did this to discriminate against him based on his disability. He has not alleged, however, that the officers (or the county) were aware of his disability, or that he asked for reasonable accommodations (such as permission to use his bedding to attract attention). The court will not allow the plaintiff to proceed on an ADA claim against Milwaukee County.

## II.    Procedural Posture

As the court noted in its April 14, 2020 order, the case has become procedurally entangled due to the court's delay in screening the complaint. The plaintiff filed his complaint on May 13, 2019; before the court had a chance to screen the complaint, the plaintiff asked the clerk's office to issue summonses, which it did. Dkt. No. 5; clerk's office docket entry of June 5, 2019. The court's law clerk realized that a screening order was needed and provided the court with a draft for review, but the court missed both the need for the screening order and the draft. As a result, Armor filed its answer, dkt. no. 7, and other parties waived service. The court extended the deadline for effectuating service.

24

Dkt. No. 13. In October 2019, several defendants filed motions to dismiss. Dkt. Nos. 47, 55, 58. Those motions have been briefed. On March 6, 2020, Armor filed a motion for judgment on the pleadings. Dkt. No. 72. The plaintiff responded, dkt. no. 75, and Armor then asked for an extension of time to reply, given the logistical challenges posed by the COVID-19 crisis, dkt. no. 77. At that point, the court realized the mess it had created, and suspended all deadlines until the court could issue this screening order. Dkt. No. 77.

The court will deny without prejudice the motions to dismiss and Armor's motion for judgment on the pleadings. Because Milwaukee County, David A. Clarke, Jr., Richard E. Schmidt, Nancy Evans, Steven Haw, Crystalina Montano, Jeffrey Andrykowski, Janet Borucki and Rafael Brito all have filed waivers of service, the court will not require them to further respond to the complaint. The court will give the remaining defendants a deadline by which to renew their motions to dismiss (or file new ones). Hopefully this will get the case back on track.

## III.  Conclusion

The court **DISMISSES** defendants John Does #1-20; George Gold; Lt. Hannah; Lt. Grove; Lt. Artus; Lt. Solomon; Lt. Turner; Lt. Majeed; Jordon Johnson; Joshua Mikulecky; Matthew Carroll; Michael Zetting; Jeffrey Hurley; Kevin Johnson; Joshua Legere; Lauren Pachmeyer; Armor Correctional Health Services, Inc.; MD Karen Horton; Karen Grey; Joel DeWitt; Mai Bruno; and Erin Quandt.

The court **DENIES WITHOUT PREJUDICE** the motion to dismiss filed by defendants Mai Bruno, Joel DeWitt and Erin Quandt. Dkt. No. 47.

The court **DENIES WITHOUT PREJUDICE** the motion to dismiss filed by defendant Karen Horton. Dkt. No. 55.

The court **DENIES WITHOUT PREJUDICE** the partial motion to dismiss filed by defendants Andrykowski, Artus, Borucki, Briggs, Brito, Carroll, Clarke, Evans, Gold, Grove, Hannah, Haw, Hurley, Johnson, Johnson, Legere, Majeed, Mikulecky, Milwaukee County, Montano, Pachmeyer, Schmidt, Solomon, Turner and Zetting. Dkt. No. 58.

The court **DENIES WITHOUT PREJUDICE** Armor's motion for judgment on the pleadings. Dkt. No. 72.

The court **ORDERS** that the suspension of deadlines it imposed on April 14, 2020 is **LIFTED**. Dkt. No. 78.

The defendants remaining after the dismissals noted above are Milwaukee County, Montano, Borucki, Brito, Clarke, Evans, Andrykowski, Haw, Schmidt, and Briggs. The court **ORDERS** that any remaining defendant wishing to file a motion to dismiss must do so by the end of the day on **August 21, 2020**.

If the court does not receive any motions to dismiss by the end of the day on August 21, 2020, the court will issue a deadline for the parties to file their Rule 26(f) plan.

Dated in Milwaukee, Wisconsin this 30th day of July, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**